Filed 1/21/26  P. v. Diaz CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DONIVAN DIAZ,<br><br>    Defendant and Appellant. | B336661<br><br>(Los Angeles County<br>Super. Ct. No. BA387967) |

    APPEAL from an order of the Superior Court of Los Angeles County, George G. Lomeli, Judge.  Affirmed.

    Julie Caleca, under appointment by the Court of Appeal, for Defendant and Appellant.

    Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Heidi Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 2014, a jury convicted Donivan Diaz and two codefendants of the first degree murder of Andrew Todd Cherry. The jury also found true felony-murder special-circumstance allegations that the murder occurred during a robbery and a burglary.  In 2020, Diaz petitioned for resentencing under Penal Code former section 1170.95.[1]  After an evidentiary hearing, the trial court denied Diaz's petition on the grounds that Diaz was a major participant in the underlying felonies who acted with reckless indifference to human life.  On appeal, Diaz contends there was insufficient evidence to support the trial court's findings.  We disagree and therefore affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Burglary and Robbery*[2]

In January 2011, Diaz lived with his brother Michael Onley.  Diaz was dating Porscha Chambers.  On January 22, Chambers and Ryan Whitmore, a woman Diaz had met that day, were at Diaz's and Onley's residence.  Diaz suggested they go to a party.  Diaz told Chambers they would go to Cherry's house first

_____

[1]    All undesignated statutory references are to the Penal Code.  Effective June 30, 2022, former section 1170.95 was renumbered to section 1172.6 with no change in text.  (Stats. 2022, ch. 58, § 10.)  We refer to the statute as section 1172.6 for the remainder of this opinion.

[2]    We take the facts from the evidence admitted at Diaz's trial.  We previously granted Diaz's Request for Judicial Notice of the record from his direct appeal, which includes transcripts from his trial.  The trial court in the instant matter admitted the transcripts into evidence, and its ruling was based on trial testimony.

2

to drink and smoke. Diaz, Whitmore, and Chambers went to a gas station to meet Cherry. Chambers purchased alcohol from a nearby store.

As planned, Diaz, Chambers, Whitmore, and Cherry then went to Cherry's house. Cherry, a large, tall man, lived alone. He sold marijuana. He also had a talking parrot.

Diaz did not have a cell phone. While at Cherry's house, Diaz made two or three calls using Chambers's phone. Diaz called Octivan Moore, known as "No-Good." After the calls, Chambers saw that Diaz was "antsy" and "fidgety."

Diaz then asked Chambers to go to the store. When she returned approximately three to five minutes later, Diaz asked her to go to his car to retrieve something. The car was parked across the street from Cherry's house.

While at Diaz's car, Chambers saw Onley and Moore standing under a tree. Chambers then received a call from Onley. Chambers believed Onley was calling her from Moore's cell phone. Onley asked Chambers where Diaz was, and she replied that he was inside Cherry's house. Onley also asked if the door to the house was open. Chambers replied that it was.

Onley and Moore pulled hoods over their heads and walked towards Cherry's house. As they approached, Whitmore was trying to leave the house. She and the two men were "fighting over the door." One of the men "grabbed" her, but she broke free. Onley and Moore went inside. Whitmore approached Diaz's car, where Chambers was standing. Whitmore asked Chambers for her purse from the car. Whitmore looked scared.

While outside, Whitmore heard what sounded like gunshots.[3] She ran away. Chambers started to follow her but stopped and returned to Diaz's car. Chambers then saw Diaz, Onley, and Moore exit Cherry's house. Onley and Moore were carrying white bags or pillowcases, which appeared to have something inside of them. Diaz returned to his car. Onley and Moore went to a different car.

Diaz told Chambers they needed to find Whitmore. They found her outside a nearby church and forced her to get in their car. Diaz drove them to a party. He went inside for 10 to 15 minutes, while Chambers and Whitmore waited in the car. Diaz then dropped Whitmore off at an unidentified house and drove himself and Chambers to a motel, where they met Moore and a woman. Moore and Diaz talked. After 45 minutes, Moore and the woman left. Diaz and Chambers stayed at the motel.

The next day, Chambers told Diaz she was concerned that she had left fingerprints in Cherry's house. Diaz responded he had "gotten it already." On a different day, Diaz told Chambers he had returned to Cherry's house on January 23 and saw Cherry lying face down. Diaz did not check to see if Cherry was alive, but simply picked up the "stuff" that belonged to him and Chambers. He told Chambers "they" had robbed Cherry and

---

[3] Evidence at trial established that Whitmore was high on PCP on the night of January 22, 2011, and that PCP can impair memory and perception and cause paranoia.

4

killed Cherry's bird because it "talked too much."[4]  At some point, Chambers saw Cherry's laptop at Diaz's house.  Diaz confirmed the laptop belonged to Cherry.

***Discovery of Cherry's Body and Investigation***

Cherry typically called his mother every day.  The last time they spoke was on January 22 between 8:15 p.m. and 8:30 p.m.  On January 23, Cherry's sister could not reach him by phone, he did not show up for a party to celebrate his son's birthday, and his brother went to his house to look for him but did not find him.  On January 24, Cherry's family members went to his house and forced open a door.  They found Cherry lying face down in a pool of blood in the living room.  His hands were tied behind his back, and his feet were bound by a jump rope.

Cherry had suffered seven gunshot wounds: four to the back of his head, one to his neck or ear area, and two to his legs.  A medical examiner determined Cherry died from the gunshots to his head and ear area.  He weighed 317 pounds and was approximately six feet tall.

Los Angeles Police Department detectives recovered nine expended .22-caliber bullet casings near Cherry, including "right at the entrance, as well as right at the threshold of the front

---

[4]    Chambers's use of "they" appeared to refer to Diaz as well as Onley and Moore.  The testimony was as follows:

"[Prosecutor]: Okay.  Did [Diaz]—did you tell the police that [Diaz] told you that they robbed [Cherry]?
"[Chambers]: Yes.
"[Prosecutor]: And did [Diaz] tell you that, in fact, they had robbed [Cherry]?
"[Chambers]: Yes."

door." Investigators found blood around Cherry's body and on the floors in the living room, the kitchen, a hallway near a bedroom, and by the front door. There was also blood on the soles of Cherry's feet.

Detectives found no signs of forced entry, other than the door Cherry's family members had forced open. The house was "ransacked." Detectives observed a computer missing from a cut cord and open drawers with clothing on the floor nearby. A couch was overturned. Insulation in the attic was pulled back immediately around the attic entrance. Detectives also found a dead bird with a "twisted" neck. There was an off-white rocky substance in the house, which was determined to be approximately one ounce of rock cocaine. Detectives also found a scale with white residue that appeared to be for drugs.[5]

Detectives discovered Diaz's fingerprint on Cherry's screen door and Whitmore's prints on a mug.

In July 2011, detectives interviewed Whitmore. The prosecution played a recording of the interview at trial. Whitmore said a man and a woman took her to Cherry's house. At some point, she decided to go outside to get her purse. Two men who were entering the house tried to grab her, and she got scared. She left, then heard gunshots and went to a nearby church. The couple who had brought her to the residence found her by the church, screamed " 'come on,' " grabbed her, put her in their car after she resisted, and later dropped her off

---

[5]     Prosecution witnesses testified that this was a large amount of cocaine that would have a high value, and that one could assume based on the amount of cocaine and the scale with a white substance on it that Cherry's home was "a place where somebody was selling dope."

"somewhere." Whitmore identified Diaz as the man who drove her to Cherry's house and forced her into the car, and Chambers as the woman who was with him.

In August 2011, Diaz and Chambers were arrested. Detectives interviewed Chambers. The prosecution played excerpts of the interview at trial. Chambers initially denied knowing what happened to Cherry, but later recounted being inside his house sometime in January 2011. She described seeing Onley and Moore enter Cherry's house wearing hoods. She also saw Diaz, Moore, and Onley leave the house together. Diaz said something like, " 'oh my god, oh my god, oh my god' " and " 'come on, come on,' " asked where Whitmore went, and said they needed to find her. Chambers did not see Diaz with a gun at any time on January 22.

During the interview, Chambers recounted: "[Diaz] told me that they have robbed [Cherry] or whatever . . . . [¶] He was like, you don't know the dude. No-Good, he said that he think the dude No-Good, shot him or whatever. I'm like how you don't know if you shot him or not, he's like my head was down. I'm like how you don't know? It's a sound, there's no way that you cannot hear a gunshot, you know I'm saying, so how you don't know if he dead or not? He just talking about they hurried up and made me leave."

In January 2011, Onley was wearing a G.P.S. ankle monitor. According to the monitor, at 9:07 p.m. on January 22, Onley was on West 53rd Street, the street on which Cherry lived. Onley then went inside a residence from 9:10 p.m. until 9:17 p.m. The next day, Onley returned to the same residence from 8:18 p.m. to approximately 8:30 p.m.

7

Less than a year before June 2011, a man stole Deserie Sherlock's cell phone. Cell phone records established that in January 2011, there were calls between Sherlock's phone and Sylvia Ortega's phone. Ortega lived with Moore and had children with him. There was also a call from Sherlock's phone to Moore's father's phone.

Chambers testified that in January 2011, Diaz occasionally used her phone to make and receive calls. On January 22, cell phone records established there were six calls between Sherlock's phone and Chambers's phone between 6:19 p.m. and 7:50 p.m. Then, at 8:12 p.m. and at 8:13 p.m., there were two calls from Chambers's phone to Sherlock's phone. Chambers also received a call from Sherlock's phone at 9:07 p.m. In all, on January 22, Chambers's phone communicated with Sherlock's phone 23 times. That was the only day the two phones were in contact.

Sherlock's phone communicated with a cell tower near Moore's house at 8:13 p.m. Between 8:29 p.m. and 8:49 p.m., Sherlock's phone's cell tower communications followed the geographic trajectory of Onley's ankle monitor from Moore's home to near Cherry's residence. Sherlock's phone had 19 incoming and outgoing calls between 8:49 p.m. and 9:24 p.m., all of which utilized a cell phone tower consistent with the phone being near Cherry's address.

The prosecution presented evidence that Diaz, Onley, and Moore were 51 Troubles gang members. The prosecution's gang expert explained that the 51 Troubles gang engaged in "lots of shootings, lots of murders."

The defense submitted testimony from Cherry's neighbors who said they had seen him alive, or heard fireworks or gunshots, on January 23, the day after the robbery.

### *Jury Verdict and Direct Appeal*

In 2014, a jury found Diaz, Onley, and Moore guilty of the first degree murder of Cherry (§ 187, subd. (a); count 1), with a true finding on felony-murder special-circumstance allegations that the murder was committed while the defendants were engaged in a robbery and a burglary (§ 190.2, subd. (a)(17)), and a true finding on an allegation that a principal discharged a firearm (§ 12022.53, subds. (d) & (e)(1)).  The jury found the gang allegation not true.  The trial court sentenced Diaz to life without the possibility of parole.

In 2016, on direct appeal, this court struck an imposed parole revocation restitution fine and otherwise affirmed the judgment.

### *Resentencing Proceedings*

In 2020, Diaz filed a petition for resentencing pursuant to section 1172.6.  He alleged he had been convicted of first or second degree murder under a felony murder or natural and probable consequences theory; he was not the actual killer; he did not, with intent to kill, aid or abet the actual killer; he was not a major participant in an underlying felony who acted with reckless indifference to human life; and he could not be convicted of murder under a currently valid theory.  The trial court appointed counsel.

The People argued that in finding the felony-murder special circumstance true, the jury either found Diaz was the actual killer, an aider and abettor who had intent to kill, or a major participant in the robbery and burglary who acted with reckless indifference for human life.

Diaz filed a brief in support of his initial petition, arguing that the jury's special-circumstance findings did not preclude

9

relief and that he was not a major participant who acted with reckless indifference.  The People filed a supplemental brief, indicating they did not oppose an order to show cause and requesting an evidentiary hearing because Diaz's felony-murder special-circumstance finding predated our high court's decisions in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).

In 2021, the trial court denied Diaz's petition without an evidentiary hearing.  It concluded that based on the jury's felony-murder special-circumstance finding, Diaz was ineligible for relief as a matter of law.

A different panel of this court reversed on appeal.  The People conceded, and we determined, that reversal was warranted due to our high court's intervening opinion in *People v. Strong* (2022) 13 Cal.5th 698 (*Strong*), which held that a felony-murder special-circumstance finding made before *Banks* and *Clark* does not preclude a petitioner from eligibility for resentencing under section 1172.6.  We remanded with directions to the trial court to issue an order to show cause and hold an evidentiary hearing.

On remand, the People filed an evidentiary hearing brief requesting that the trial court take judicial notice of our decision from Diaz's 2016 appeal, the clerk's transcript from the appeal, and reporter's transcripts from his trial.  Diaz filed an evidentiary hearing brief that attached this court's opinion resolving the appeal from the denial of his first petition for resentencing.

In January 2024, the trial court held an evidentiary hearing.  The parties did not submit additional evidence.  The court denied Diaz's petition, finding the People had proven

beyond a reasonable doubt that Diaz was a major participant who acted with reckless indifference to human life and was therefore not entitled to resentencing. The court recited the facts in the case as established at trial, then considered each of the *Banks* and *Clark* factors before denying the petition. Diaz timely appealed.

## DISCUSSION

### I. Substantial Evidence Supports the Trial Court's Denial of the Petition

#### A. Senate Bill No. 1437 and section 1172.6

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437) limited the scope of the felony-murder rule. (*Strong*, *supra*, 13 Cal.5th at pp. 707–708; *People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*).) It added section 189, subdivision (e), which establishes that "[a] felony-murder conviction may no longer rest on the mere commission of and intent to commit an underlying felony. If a defendant was not the actual killer or an aider and abettor acting with intent to kill, the statute now requires that the defendant be a major participant in the felony who acted with reckless indifference to human life." (*People v. Emanuel* (2025) 17 Cal.5th 867, 875 (*Emanuel*), citing § 189, subd. (e)(3).)

Senate Bill No. 1437 also added former section 1170.95, now section 1172.6, to the Penal Code, which created "a procedural mechanism for those previously convicted of murder under a theory amended in [Senate Bill No. 1437] to petition for resentencing." (*Emanuel*, *supra*, 17 Cal.5th at p. 880; see also *Lewis*, *supra*, 11 Cal.5th at p. 959.) If a defendant files a petition setting forth a prima facie case that he or she could not be presently convicted of murder because of changes to the law

11

implemented by Senate Bill No. 1437, the trial court must issue an order to show cause. (*Emanuel*, at p. 880; § 1172.6, subd. (c).) Within 60 days, " 'the court must hold an evidentiary hearing at which the prosecution bears the burden of proving, "beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder" under state law as amended by Senate Bill No. 1437 . . . .' " (*People v. Njoku* (2023) 95 Cal.App.5th 27, 41; § 1172.6, subd. (d)(1), (3).) At the hearing, the trial court sits as "a fact finder tasked with holding the People to the beyond a reasonable doubt standard." (*People v. Clements* (2022) 75 Cal.App.5th 276, 294–295.)

### B.      Standard of review

We review the trial court's order after an evidentiary hearing for substantial evidence. (*Emanuel*, *supra*, 17 Cal.5th at p. 885.) " 'We " 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the necessary fact] beyond a reasonable doubt.' " [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt.' [Citations.]" (*People v. Oliver* (2023) 90 Cal.App.5th 466, 480.) Our substantial evidence review includes circumstantial evidence and reasonable inferences drawn from that evidence. (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) We may reverse the trial court's

12

order only if it is clear that " ' "upon no hypothesis whatever is there sufficient substantial evidence to support [it]" ' . . . ." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

### C. "Major participant" and "reckless indifference" factors

Our high court in *Banks*, *supra*, 61 Cal.4th 788, and *Clark*, *supra*, 63 Cal.4th 522, addressed the factors a court considers in determining whether a defendant was a "major participant" in an underlying felony who acted with "reckless indifference to human life." (*Emanuel*, *supra*, 17 Cal.5th at p. 883 [*Banks* and *Clark* guide the analysis in § 1172.6 felony murder case].)

In *Banks*, the court considered the factors applicable to a court's determination of a "major participant." (*Banks*, *supra*, 61 Cal.4th at pp. 794, 803.) These factors are: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.)

In *Clark*, the court explained "reckless indifference to human life." This requirement "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at p. 617; accord, *Emanuel*, *supra*, 17 Cal.5th at p. 883.) Reckless

13

indifference involves "both subjective and objective elements." (*Clark*, at p. 617.) "The subjective element is the defendant's conscious disregard of risks known to him or her." (*Ibid*.) "As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.]" (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).) The objective analysis of recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,'" that is, whether defendant's conduct " 'involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.' [Citation.]" (*Clark*, at p. 617.)

*Clark* also enumerated factors a court is to consider when determining whether a defendant acted with reckless indifference. (*Clark*, *supra*, 63 Cal.4th at pp. 618–622.) In *Scoggins*, our high court summarized those factors: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins*, *supra*, 9 Cal.5th at p. 677; *Clark*, at pp. 618–622.)

" 'The degree of risk to human life is crucial to the [reckless indifference] analysis.' [Citation.]" (*Emanuel*, *supra*, 17 Cal.5th

14

at p. 884.) However, being aware of the foreseeable risk of death inherent in any violent felony is insufficient, thus our high court has "made clear that participation in a ' "garden-variety armed robbery," ' i.e., one in which the only factor supporting a reckless indifference finding is that a participant was armed with a gun, is insufficient without more to establish reckless indifference." (*Ibid.*; *People v. Hin* (2025) 17 Cal.5th 401, 449 (*Hin*) ["participation in an armed robbery is insufficient, without more, to establish reckless indifference to human life"].)

" '[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, *supra*, 63 Cal.4th at p. 618, quoting *Banks*, *supra*, 61 Cal.4th at p. 803.) Instead, we "analyze the totality of the circumstances to determine whether [the defendant] acted with reckless indifference to human life." (*Scoggins*, *supra*, 9 Cal.5th at p. 677; accord, *Emanuel*, *supra*, 17 Cal.5th at p. 885.)

### D.    Major participant factors
***Role in planning the criminal enterprise that led to the death.***

There is evidence that Diaz played a significant role in planning the burglary and robbery. Cell phone data and other testimony established that Diaz, using Chambers's phone, and Moore, using Sherlock's stolen cell phone, were in frequent communication on January 22, including in the hours before the crimes at Cherry's home. In her interview with police, Chambers said Diaz went to another person's house and Diaz asked for Cherry's telephone number, then he called Cherry. Chambers further testified that before they went to the gas station, Diaz had already told her they were going to Cherry's house to drink and smoke. Diaz, Chambers, and Whitmore then met Cherry at

15

a gas station and went to his house. This evidence demonstrates Diaz arranged the defendants' access to Cherry's house.

Once inside Cherry's home, Diaz used Chambers's phone to call Moore at least twice. After the calls, Diaz appeared antsy and fidgety. Diaz also asked Chambers to leave the house twice, once to go to the store and, when she quickly returned, to get something from his car. It is reasonable to infer that he did not want her present for whatever would take place.

Onley called Chambers while she was at Diaz's car and asked where Diaz was before Onley and Moore entered Cherry's home. Onley and Moore's nefarious purpose was unmistakable to Chambers when she saw them putting hoods on their heads, further suggesting advanced planning.

Diaz's acts of seeking Cherry out on the night of the murder, gaining entry to Cherry's home, communicating with Moore throughout that night, and Diaz's apparent awareness that Chambers should not be in Cherry's house after a certain point in time, all indicate Diaz had a substantial role in planning the crimes. (Cf. *In re Bennett* (2018) 26 Cal.App.5th 1002, 1019 [defendant "instrumental in setting up the plan and carrying it out" because he used prior connections with drug dealer the group planned to rob "to arrange and set up what turned into the fatal encounter"].)

***Supplying or using lethal weapons.***

Although Cherry was fatally shot, there was no evidence as to whether Diaz supplied or used a weapon. The only evidence identifying a shooter was Chambers's testimony that Diaz told her Moore shot Cherry.

16

***Awareness of the dangers.***

  The third *Banks* factor requires consideration of Diaz's "awareness . . . of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants." (*Banks*, *supra*, 61 Cal.4th at p. 803.)

  There is no evidence to show whether Diaz knew Onley or Moore had a weapon before the crimes occurred. There is also no evidence as to whether he was aware of his cohorts' violent nature before the crimes. That Onley and Moore were gang members is insufficient to show violent propensity. (See *Banks*, *supra*, 61 Cal.4th at pp. 805, 810 [no evidence gang members in armed robbery had previously committed murder, attempted murder, or any violent crime]; *In re Miller* (2017) 14 Cal.App.5th 960, 976 [same].)

  However, it is reasonable to infer that Diaz was aware of the likely need to use significant force to carry out the burglary and robbery. At over 300 pounds and six feet tall, Cherry was a large man. He also sold drugs. (See, e.g., *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089 (*Bascomb*).) The evidence established that Diaz would have known it was highly likely that, at a minimum, a demonstrable threat of significant force would be necessary to accomplish a robbery of Cherry in his own home, and that it would be necessary to restrain or subdue Cherry in some fashion to carry out the crimes.

  Further, "[w]hatever petitioner may or may not have believed about the plan for the robbery at the outset . . . he was clearly aware of the risk of death once the robbery was underway." (*In re Harper* (2022) 76 Cal.App.5th 450, 461.) The evidence established that although nine shots were fired, and Cherry suffered seven gunshot wounds, not all nine shots could

17

have been fired in immediate succession.  Instead, Cherry was shot, then bled in several areas of his house and in such a way that he got blood on his feet and blood on the floor before being tied up and fatally shot.  Even if Diaz was not the shooter and had not planned the use of lethal force, after those initial shots the risk of death would have been obvious.  (*People v. Montanez* (2023) 91 Cal.App.5th 245, 273 ["warning signs that the crimes posed a serious risk of danger to the victims accumulated as the crimes unfolded"].)

***Presence at the scene and role in the victim's death.***

There is substantial evidence that Diaz was at the scene of the murder.  Diaz contends the evidence does not establish exactly where he was inside the house when Moore killed Cherry.  Yet, Diaz's own statement to Chambers established his presence at the scene of the killing.  Diaz told Chambers he thought Moore shot Cherry but was unsure because his "head was down."  Thus, he claimed he did not see who shot Cherry because he was not looking, or he was deliberately avoiding seeing, not because he was in a different room.

Diaz also asserts there is no evidence he could have intervened or restrained his cohorts to prevent the murder.  He argues that because Cherry was shot after being tied up, this "suggests an impulsive decision to kill by the shooter."  We disagree.

Diaz was present for the events leading up to the murder, including the initial shots, the movement of Cherry in the house, the binding of Cherry's hands and feet, and the fatal shots. (*Tison v. Arizona* (1987) 481 U.S. 137, 152 (*Tison*) [concluding non-shooters' "participation in the crime was anything but minor" because they were physically present for events leading up to the

murder, which took place after kidnapping and robbery].) Diaz did not leave the house until the ordeal was over, accompanied by Moore and Onley carrying Cherry's possessions out of the house. His continued presence for all the acts that culminated in Cherry's killing supported a finding that he was a major participant.

The two cases Diaz cites for the proposition that he could not have intervened while present at the scene are materially different. Both involved evidence that the defendant was unable to restrain his cohorts or otherwise intervene during a quickly unfolding shooting. (Cf. *People v. Ramirez* (2021) 71 Cal.App.5th 970, 989 [during carjacking defendant was on passenger side and did not have opportunity to intervene when shooter on driver's side " '[went] crazy' and began to shoot"]; *In re Ramirez* (2019) 32 Cal.App.5th 384, 405 [during unplanned killing in response to victim resistance, defendant was "on the street, and there were cars parked in the parking lot between their location and where the shooting occurred"].) There is no such evidence here. In between an initial shot or shots and the fatal shots, Cherry moved around his house and was tied up and bound. Irrespective of the exact circumstances of the fatal shots that were fired, this was not a quickly unfolding shooting as in either *Ramirez* case.

**Actions after lethal force.**

The final *Banks* factor considers Diaz's actions after Cherry was fatally shot. Diaz left the house with his cohorts. He searched for a potential witness and forced her into his car. He then went to a party and met up with Moore at a motel. They talked. There is no indication that Diaz was angry or upset with Moore or Onley for how the night's events unfolded. Diaz later returned to Cherry's home to remove any incriminating evidence.

19

Onley also returned to the house. Diaz saw Cherry face down but did not do anything at that point, or earlier, to call for help. He never checked to see if Cherry was alive. He did, however, obtain Cherry's stolen laptop computer. (*People v. Gonzalez* (2016) 246 Cal.App.4th 1358, 1386 [defendant made no attempt to come to victim's aid or summon help after victim was shot, "chose to flee with the shooter," and accompanied cohort in disposing of murder weapon].)

Considering the totality of the above factors, there was substantial evidence supporting the trial court's finding that Diaz was a major participant in the burglary and robbery.

### E. Reckless indifference factors

Substantial evidence also supports the trial court's conclusion that Diaz acted with reckless indifference to human life.

***Use of or awareness of the presence of weapons and knowledge of cohorts' likelihood of killing.***

The record is silent as to whether the plan for the burglary and robbery involved the use of a lethal weapon, whether Diaz used a weapon, whether he knew Moore or Onley had armed themselves, or whether he knew his cohorts had committed violent crimes. This factor therefore does not weigh in favor of finding Diaz acted with reckless indifference. (See *Emanuel*, *supra*, 17 Cal.5th at p. 885 [defendant did not use a weapon during robbery and no evidence defendant knew codefendant would bring a gun or had a propensity for violence]; *People v. Guiffreda* (2023) 87 Cal.App.5th 112, 126, 128; accord, *People v. Underwood* (2024) 99 Cal.App.5th 303, 317, 318.)

***Duration of the crime.***

We next consider the length of the interaction. "Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder. The duration of the interaction between victims and perpetrators is therefore one consideration in assessing whether a defendant was recklessly indifferent to human life." (*Clark*, *supra*, 63 Cal.4th at p. 620.)

Here, the burglary began when Diaz entered Cherry's home, which cell phone data suggested was around one hour before Onley and Moore arrived. (*People v. Tafoya* (2007) 42 Cal.4th 147, 170 [burglary requires entry with intent to commit theft or any felony].) However, our high court's reasoning in *Emanuel* suggests the "relevant timeframe" is the "period of the violent confrontation." (*Emanuel, supra,* 17 Cal.5th at p. 886.) G.P.S. evidence showed Onley was inside Cherry's home beginning at 9:10 p.m. and ending by 9:17 p.m.[6]

---

[6] The evidence created a reasonable inference that violence may even have begun slightly before Onley and Moore entered the house. Whitmore was extremely intoxicated upon arriving at Cherry's home, she seemed "happy," and she gave Cherry a lap dance. However, as Onley and Moore approached the front door, Whitmore was attempting to leave in a manner that suggested something had already started to happen inside. She forced her way out of the house, looked scared, and demanded her purse, all *before* she heard gunshots and fled. In one portion of her interview with police, Chambers said that when Onley and Moore opened the door to Cherry's house, Chambers saw Whitmore "screaming. She's like, she just jumped out of the porch and she screaming like she just standing there like shocked and they

21

A six or seven-minute period is not a lengthy interaction pointing towards reckless indifference by itself. (See *Emanuel*, at p. 886 [nine-minute duration "neutral"]; *Scoggins*, *supra*, 9 Cal.5th at p. 681 [defendants had "only a brief conversation before Powell pulled out a gun and shot Wilson. The witnesses estimated that the entire interaction lasted between a few seconds and three to five minutes."].) Yet, assuming that the violence did not begin until Onley and Moore entered the house, within that six or seven-minute period, nine shots were fired, but not all at once. Cherry was shot, moved through the house, had his hands and feet bound, and was ultimately shot again, including in the back of the head. In the same period, the house was ransacked and items from Cherry's home were placed in bags or pillowcases to be carried away.[7] As the trial court found, Cherry was "taken to various parts of the residence during the infliction of his seven gunshot wounds, all the while [appellant], along with the other individuals, ransack[ed] the home and ultimately [left] with the stolen items." Whitmore heard gunshots almost immediately after Onley and Moore entered, indicating that the entire six or seven-minute period was filled with increasingly severe violence.

The manner in which the crimes unfolded here demonstrates that each minute provided " 'a greater window of

---

snatched her, they try to snatch her in but she's fighting them off so like they pushed her off and they closed the door."

[7]     It is possible that Diaz and Onley further ransacked Cherry's house when they each returned after the killing. However, at least some searching or gathering of items occurred during the six or seven-minute incident, evidenced by Onley and Moore carrying items out of the house.

opportunity for violence' [citation], possibly culminating in murder." (*Clark*, *supra*, 63 Cal.4th at p. 620; see *Tison*, *supra*, 481 U.S. at pp. 151–152 [defendants kidnapped and guarded victims at gunpoint while father decided whether to kill victims]; cf. *Scoggins*, *supra*, 9 Cal.5th at p. 679 ["how quickly the shooting occurred" indicated defendant "lacked control over" the actions of cohorts].) Under the circumstances of this case, the duration of the crimes weighed in favor of a finding of reckless indifference. (See *In re Parrish* (2020) 58 Cal.App.5th 539, 544 ["brevity of the robbery" did not make defendant "less blameworthy"]; cf. *Emanuel*, *supra*, 17 Cal.5th at p. 886 [no prolonged period of restraint and interaction was nonviolent for most of the nine-minute period].)

***Efforts to minimize the risks of violence during the felony.***

As our high court recently emphasized, this factor considers efforts at the planning stage and not actions to "restrain confederates or aid victims" during a robbery. (*Emanuel*, *supra*, 17 Cal.5th at p. 887.) We may consider circumstantial evidence to determine whether Diaz planned the robbery to minimize the risks of violence, which includes knowledge of whether his collaborators had a propensity for violence. (*Ibid*.) A defendant may plan a crime to minimize the risk of violence when the crime is to occur without the use of weapons (cf. *ibid*.; *Scoggins*, *supra*, 9 Cal.5th at p. 683), or to take place in public and thus in the presence of potential witnesses. (*Scoggins*, at p. 683 ["Scoggins agreed to have the confrontation take place in a public parking lot during the daytime, when the possible presence of witnesses might reasonably be thought to keep his accomplices within the bounds of the plan"].)

Here, Diaz attempted to exclude a witness and planned for the crime to take place in a private home. Diaz and his accomplices planned the robbery for a time when they knew Cherry was home. Cherry was a large man who likely would not be easy to subdue and was known to sell drugs. This was not like an ordinary armed robbery in a store or of a person on a street, " 'in which resistance, if any, would be slight, and armed resistance likely nonexistent. This was the planned, . . . robbery of a known drug dealer at his residence.' " (*Bascomb*, *supra*, 55 Cal.App.5th at p. 1090.) Violence was more likely because "confronting people inside the home was part of the plan." (*Ibid*.)

As the court explained in *Emanuel*, "the absence of efforts to minimize the risk of violence cannot be said to weigh in favor of a finding of reckless indifference." (*Emanuel*, *supra*, 17 Cal.5th at p. 888.) However, as described in *Emanuel*, if a defendant planned an armed home invasion robbery at 3:00 a.m. "with knowledge of several armed occupants and a methamphetamine operation within," then "a trier of fact might reasonably conclude that the objective risk of violence posed by the crime and reasonably anticipated by the perpetrator is graver than the risk of violence inherent in any violent felony." (*Id*. at p. 889, citing *In re McDowell* (2020) 55 Cal.App.5th 999, 1005.) Here, Diaz planned a home invasion robbery of Cherry, a drug dealer, when he knew Cherry would be home. While the objective risk of violence posed by this crime and reasonably anticipated by Diaz may not have been as grave as the example in *Emanuel*, the trial

court could reasonably conclude the risk was still graver than the generic risk of violence inherent in any violent felony.[8]

***Physical presence at the scene and an opportunity to restrain cohorts or aid the victim.***

"Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the [co-]participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.' [Citation.]" (*Clark*, *supra*, 63 Cal.4th at p. 619.)

Our high court recently clarified that "[a]lthough we consider whether a defendant acts as a restraining influence on his cohorts, it is not incumbent on a defendant to actually prevent the violence or attempt to do so by any means necessary." (*Emanuel*, *supra*, 17 Cal.5th at p. 891.) Rather, "[t]he essential question underpinning our analysis is not whether [Diaz] did enough to try to stop [his codefendant's] unplanned act of violence; it is whether [Diaz] acted with the requisite mens rea,

---

[8]     The circumstances here indicated a graver risk of violence than that presented in *Emanuel* "where [the] defendant plan[ned] to commit an unarmed robbery of a marijuana dealer at a public park in the middle of the afternoon . . . ." (*Emanuel*, *supra*, 17 Cal.5th at p. 889.)

i.e., reckless indifference to human life. The focus should not be on the ultimate *efficacy* of his actions, but on what his actions reveal about his mental state." (*Ibid.*)

There is no direct evidence to establish exactly what Diaz did during the six or seven minutes that culminated in Cherry's killing. But the nature and duration of the incident were such that all three men had to have been involved in at least some aspect of the crimes: shooting Cherry in the legs, restraining him, tying him up, shooting him in the head and face, ransacking or searching the house, and gathering the items Onley and Moore eventually took out of the house. The only logical inference from the evidence is that Diaz was actively engaged in one or more of these activities. Even if Diaz's conduct was limited to ransacking the house while Onley and Moore perpetrated the direct violence on Cherry, Diaz was present in the house the entire time. It is reasonable to conclude that he shared their mental state. (*Clark*, *supra*, 63 Cal.4th at p. 619.) While "the opportunity for intervention may have been brief, the shooters . . . made their intentions clear, affording [Diaz] 'the time to observe and react before the murder.' [Citation.]" (*Emanuel*, *supra*, 17 Cal.5th at p. 892.)

Cherry's killing was not the result of a single shot, intended to be nonlethal. Although the fatal shots did not happen without warning, there is no evidence that Diaz "advocated" that he and his cohorts leave or did anything else to restrain his cohorts. (Cf. *Emanuel*, *supra*, 17 Cal.5th at p. 891; *id*. at p. 879; *People v. Keel* (2022) 84 Cal.App.5th 546, 560 [factor neutral where cohort's decision to shoot was made "quickly" in response to victim's "unexpected resistance"].) Indeed, Diaz told Chambers he merely kept his "head down." (*In re Loza* (2017) 10 Cal.App.5th 38, 54

[defendant did nothing to intercede or stop shooting by confederates during five-second countdown during robbery].)

In addition, a failure to aid a victim after a shooting may show reckless indifference. (*Hin*, *supra*, 17 Cal.5th at p. 450; *Clark*, *supra*, 63 Cal.4th at p. 619; but see *Emanuel*, *supra*, 17 Cal.5th at p. 893, quoting *Scoggins*, *supra*, 9 Cal.5th at p. 679 [" 'when different inferences may be drawn from the circumstances, the defendant's actions after the shooting may not be very probative of his mental state' "].)

Diaz did nothing to aid Cherry. This is probative of his mental state because there is no evidence that Diaz thought aid was on its way. (Cf. *In re Taylor* (2019) 34 Cal.App.5th 543, 559.) There were neither witnesses who would presumably come to Cherry's aid, nor any indication that law enforcement would arrive shortly. Indeed, Diaz was intent on tracking down Whitmore and forcing her into his car, thereby effectively preventing her from revealing that anything was amiss at Cherry's house. The facts here are unlike cases in which the defendant might have assumed the victim was likely to receive aid, such that failure to render aid was not probative of reckless disregard for the victim's life. (Cf. *Emanuel*, *supra*, 17 Cal.5th at p. 894; *Scoggins*, *supra*, 9 Cal.5th at p. 680.) Rather, Diaz left Cherry alone inside his house at night, making it unlikely that he would receive aid in any timely manner. (*Tison*, *supra*, 481 U.S. at p. 141 [reckless indifference where non-shooter defendants made no effort to help victims and left them in a desert].)

Diaz contends that because the shots to Cherry's head were lethal, any assistance would have been futile. However, there is no evidence that Cherry died immediately or that Diaz knew this. He did not check to see if Cherry was still alive, even when he

27

returned to the residence later. (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 593 [defendant never checked for pulse or breath]; cf. *Scoggins*, *supra*, 9 Cal.5th at p. 680 ["Scoggins walked over to the crime scene and checked if [the victim] was still breathing after the shooting"].)

### F. Totality of the circumstances

In sum, the evidence establishes that Diaz played a significant role in planning the burglary and home invasion robbery. Diaz planned or participated in planning the crime for a time when the victim was home. Cherry was a large man who sold drugs. Diaz would have known that it would be necessary to use or threaten significant force to rob Cherry. Diaz was present at the scene of the killing, which came after initial, non-fatal shots to Cherry's legs, after Cherry had moved or was forced to move to several areas of the house, and after Cherry's hands and feet were bound. After Cherry was shot four times in the back of the head, Diaz left with his cohorts, forced a witness into his car, met up with Moore, and failed to assist the victim. He also returned to the crime scene to recover potentially incriminating evidence. To be a major participant, "what is required is that petitioner was a major participant in a robbery known to carry a grave risk of death, not that he was a major participant in the murder." (*People v. Richardson* (2022) 79 Cal.App.5th 1085, 1092; see also *Clark*, *supra*, 63 Cal.4th at p. 611.) The evidence, when viewed in the light most favorable to the trial court's decision, establishes that Diaz was a major participant in a burglary and robbery, which, as it unfolded, revealed a grave risk of death.

As for reckless indifference, even though the crimes took place during a relatively short period, they occurred in a violent

manner that established a risk of lethal violence and presented Diaz with an opportunity to act as a restraining influence.  Yet there is no evidence that Diaz attempted to stop or minimize the violence or to aid Cherry after the fact, creating a reasonable inference of a mental state of reckless indifference.  Considering the evidence in the light most favorable to the trial court's determination, we conclude that substantial evidence supports the finding that Diaz acted with reckless indifference because he had a "willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions."  (*Clark, supra,* 63 Cal.4th at p. 617.)

The *Banks* and *Clarks* factors support the trial court's denial of Diaz's petition for resentencing.

## DISPOSITION

The order denying Diaz's petition for resentencing is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EGERTON, Acting P. J.

HANASONO, J.